## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCHES OF:** | ) |
| | )      **Case No.** |
| **Apple iPhone Model A1660** | ) |
| **FCC ID: BCG-E3085A** | ) |
| **IC: 579C-E3085A** | ) |
| **(DEVICE 1)** | ) |
| | ) |
| **Apple iPhone Model A1784** | ) |
| **FCC ID: BCG-E309A** | ) |
| **IC: 579C-E3092A** | ) |
| **(DEVICE 2)** | ) |
| | ) |
| **ZTE Flip Phone Model: Z233V** | ) |
| **SKU: Z233VPP** | ) |
| **Serial Number: 329F758860D2** | ) |
| **IMEI: 99008870366718** | ) |
| **MEID HEX: 99000887036671** | ) |
| **(DEVICE 3)** | ) |
| | ) |
| **BlackBerry Cellular phone** | ) |
| **Device name: D238** | ) |
| **Model BlackBerry Q10** | ) |
| **Model Number: SQN100-5** | ) |
| **Serial Number: 0732-6807-6064** | ) |
| **(DEVICE 4)** | ) |
| | ) |
| **BlackBerry Cellular phone** | ) |
| **PRD-53241-004 BlackBerry Q10 SQN100-5,** | ) |
| **FCC ID L6ARFP120LW, PIN: 2BAC5277,** | ) |
| **IMEI: 356762050339501** | ) |
| **(DEVICE 5)** | ) |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Joshua M. Miller, Special Agent, Federal Bureau of Investigation (FBI), Washington

Field Office (WFO), Washington, D.C., (herein "affiant") being duly sworn, depose and state the

following:

## INTRODUCTION

1.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of five cellphones that are currently in law enforcement possession, as described in Attachments A-1 through A-5 (incorporated herein by reference), and the extraction from that property of electronically stored information as described in Attachment B (incorporated by reference).

2.       I am "an investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3.       I have been a Special Agent (SA) with the FBI since March 2017. Prior to joining the FBI, I served as an officer in the United States Marine Corps where I received training and operational experience in various law enforcement areas, including rule of law. I worked closely with Iraqi Police and Iraqi Military counterparts on two overseas deployments conducing various operations to include searching for improvised explosive device makers and other terrorists. I am currently in the FBI's Washington Field Office (WFO) on a squad which is responsible for conducting investigations that target large drug trafficking organizations. From July 2017 to the present, I have been working on federal narcotics investigations and I have participated in several investigations that led to the arrest and conviction of multi-kilogram narcotics distributors. I have authored search warrants and GPS phone tracking warrants. I have received training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics, white-collar crimes, search warrant applications, and the investigation of various other crimes. In the course of my training and experience, I have become familiar with the methods and

techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; supporting undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; and preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband. I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Further, I have participated in numerous drug and firearm trafficking investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms.

4.      Through instruction, training, and participation in investigations, as well through consultation with other agents and law enforcement personnel, I have become familiar with the manner and methods by which narcotics traffickers conduct their drug trafficking operations.

5.      Since this affidavit is being submitted for the limited purpose of obtaining a search warrant for cellphones, I have not set forth each and every fact learned during the course of this investigation. Facts not set forth herein are not being relied upon in this affidavit in support of the warrant. I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other agents and law enforcement officers, reports and data provided by other officers which I have read and reviewed, and, in part, upon information and belief. The sources of my information and belief include, but

are not limited to: a) oral and written reports regarding this and other investigations which I have received, directly or indirectly, from agents of the FBI, and other law enforcement officers; and b) physical surveillance conducted by your affiant and other agents and officers who have reported to me directly or indirectly.

## AFFIANT'S KNOWLEDGE, TRAINING, AND EXPERIENCE RELATING TO CELLULAR PHONES

6.      Based on your affiant's knowledge, training, and experience, a cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

7.      In addition to enabling voice communications, cellular telephones offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. In this capacity, your affiant knows that a cellular phone has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, audio and video recording device, and personal digital assistant (PDA), and can store information for long periods of time. Similarly, information that has been viewed via the Internet is typically stored for some period of time on the device.

Even when a user deletes information from a cellular phone, it can sometimes be recovered with forensics tools.

8.      In your affiant's training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device. Your affiant also knows that those involved in criminal activities take, or cause to be taken, photographs of themselves, their associates, property derived from their criminal activities, and their products, on cellular telephones.

9.      Your affiant has consulted with forensic cellular phone examiners who regularly conduct examinations of cellular phones and has learned that conducting cellular phone examinations is a highly technical process using specific tools for which the examiners receive training.

## AFFIANT'S KNOWLEDGE OF CELLPHONES REGARDING THE TRAFFICKING OF NARCOTICS

10.      Based on your affiant's knowledge, training, and experience, and in the knowledge, training, and experience of other members of FBI, cellphones are tools of the narcotics trade. Narcotics traffickers communicate with customers, suppliers, and coconspirators via cellphones. Narcotics traffickers use cellphones to arrange meetings, request narcotics, take narcotics orders, and arrange for coconspirators to obtain and distribute narcotics. To avoid detection by law enforcement, drug traffickers commonly use more than one cellphone and often send text messages, rather than engage in oral communications.

11.      Cellphones used by narcotics traffickers contain valuable information and evidence relating to their narcotics trafficking. Such information consists of, but is not limited to: call logs,

phone books, photographs, voice mail messages, text messages, images and video, Global

Positioning System data, and any other stored electronic data. This information can: (i) reflect the

preparation for, arrangement of, and commission of the trafficking of narcotics; (ii) identify

locations where narcotics traffickers traveled to before and after transporting or selling narcotics;

(iii) reflect the ownership and use of the cellphones by the narcotics traffickers; (iv) document

meetings and communications between narcotics traffickers, their customers, associates, and

coconspirators; (v) reflect communications between narcotics traffickers and other individuals,

discussing the trafficking of narcotics; (vi) reflect communications between narcotics traffickers

and other individuals who may have assisted or provided support in the trafficking of narcotics;

(vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the

concealment of narcotics relating to the trafficking of narcotics; and (viii) document or contain

evidence of the purchase of items from the assets derived from the trafficking of narcotics.

12.     Many cellphones have picture-taking devices on them. My law enforcement

training and experience indicates that drug-dealers like to take pictures or videos of themselves,

their drugs, the money made from selling drugs, and the persons with whom they work, that is,

with whom they sell drugs.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

13.     The property to be searched are five separate cellphones, identified as DEVICES

1 through 5 that were recovered by law enforcement on August 14, 2018 following the execution

of three search warrants relating to an ongoing FBI investigation. As set forth in Attachments A-

1 through A-5, all five cellphones are currently in the possession of the FBI, at its secure facility,

located at 601 4th Street, Northwest, Washington, D.C. Each cellphone was given a unique

property number in the FBI's evidence vault as it pertains to the FBI's ongoing investigation in

this matter.

14.     As discussed *infra*, your affiant believes there is probable cause that Devices 1 through 5 (as described in Attachments A-1 through A-5, as incorporated herein), contain evidence of violations of 21 U.S.C. § 841(a)(1); 21 U.S.C. § 841(b)(1)(C) and 21 U.S.C. § 860(a) (drug trafficking offenses) (collectively, the "target offenses"), as well as, evidence of identification, that would further establish the individuals who committed the target offenses (as described and detailed further in Attachment B, as incorporated herein).

## PROBABLE CAUSE

15.     A Confidential Human Source ("CS") has been cooperating with the FBI since May 2016. The CS is cooperating pursuant to the terms of a cooperation plea agreement for a felony narcotics trafficking offense, affording the CS the opportunity to receive a recommendation for a more lenient sentence in exchange for substantial assistance.. The CS's criminal history includes a conviction for conspiracy to commit violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). The CS has proven to be reliable and, to the government's knowledge, has never provided information that has proven to be false or misleading.

16.     In February of 2018, at the direction of law enforcement, a confidential source ("CS") began making controlled purchases of cocaine from Robert Thomas Irwin (the "defendant"), who is a known narcotics trafficker in Washington, D.C. Per the grand jury's indictment, the CS has made ten controlled purchases totaling approximately  537 grams of cocaine. Prior to each buy, the CS met with law enforcement agents, who searched the CS's vehicle and person. The CS was then provided a recording device and pre-recorded law enforcement funds. After each purchase, an FBI agent met with the CS at a secure location, where the CS was again searched, and the drugs and recording device were collected. Following each purchase, a portion

of the suspected cocaine was subjected to a preliminary field test, which showed a positive color reaction for the presence of cocaine. At no point did the FBI deviate from this sequence, thereby ensuring that the CS did not secrete drugs or money into or out of each controlled purchase. Prior to each controlled purchase, the CS and the defendant communicated via text or voice through cellular telephones.

17.     On February 14, 2018, under law enforcement supervision, the CS purchased approximately one ounce of cocaine from the defendant. Prior to the purchase, the CS arranged to meet with the defendant at the corner of 12th Street Northwest, and Q Street Northwest, Washington, D.C. At approximately[1] 1:26 p.m., agents observed the defendant's vehicle, a white Infiniti sedan bearing VA tag VBB-1640 parked at 12th Street, Northwest and Q Street, Northwest, Washington, D.C. After receiving an audio-recording device, and pre-recorded law enforcement funds, the CS drove to the pre-arranged transaction site. At approximately 1:47 p.m., the CS arrived at the predetermined buy location, walked over to the defendant's white Infiniti, and entered the front passenger seat. The CS gave the defendant the law enforcement funds in exchange for a plastic bag containing a white powdery substance, which the defendant drew from a black bag inside his vehicle. The white powdery substance later field-tested positive for the presence of cocaine and weighed approximately 29.6 grams. Following the transaction, the CS exited the defendant's vehicle, at approximately 1:53 p.m. and met with agents. Agents searched the CS before and after the controlled purchase and found no contraband. At approximately 1:55 p.m. the defendant left the buy location in his vehicle traveling east on Q Street, Northwest. At approximately 1:58 p.m., the defendant's white Infiniti was observed parked at 11th Street, Northwest and Q Street, Northwest in front of the Holm apartment building, 1550 11th Street,

---

[1] All times referenced within should be considered approximate times.

Northwest. At approximately 2:21 p.m., agents observed the defendant exit the apartment building carrying a black bag. The defendant approached the rear of his vehicle, opened the trunk, and placed the bag inside the trunk. The defendant departed the area at approximately 2:28 p.m., and surveillance was terminated at approximately 2:30 p.m. This controlled purchase occurred within 1000 feet of Seaton Elementary School.

18.     On February 22, 2018, under law enforcement supervision, the CS purchased approximately one ounce of cocaine from the defendant. Prior to the purchase, the CS arranged to meet with the defendant in the vicinity of 33rd Street, Northwest and N Street, Northwest, Washington, D.C. After receiving an audio-recording device, and pre-recorded law enforcement funds, the CS drove to the transaction location. Not long after the CS arrived at the predetermined buy location, the defendant was seen parked in his known vehicle, a white Infiniti sedan with VA tag VBB-1640, on N Street, Northwest in the vicinity of 33rd Street, Northwest. The CS approached the defendant's vehicle and entered the front passenger seat. The CS gave the defendant the law enforcement funds in exchange for a plastic bag containing a white powdery substance, which later field-tested positive for the presence of cocaine, and weighed approximately 29.6 grams. Following the transaction, the CS exited the defendant's vehicle. Agents searched the CS and the CS's vehicle before and after the controlled purchase and found no contraband.

19.     On March 1, 2018, under law enforcement supervision, the CS purchased approximately one ounce of cocaine from the defendant in exchange for $1,400. Prior to the purchase, the defendant arranged to meet with the CS in the vicinity of Bladensburg Road, Northeast and V Street Northeast, Washington, D.C. After receiving an audio-recording device and pre-recorded law enforcement funds, FBI agents transported the CS to a location near the

transaction location. A short time later, the defendant arrived at the predetermined buy location in his white Infiniti; the CS walked to the defendant's vehicle, entered the front passenger seat, and gave the defendant the law enforcement funds in exchange for a plastic bag containing a white powdery substance. Following the transaction, the CS exited the defendant's vehicle and the defendant drove out of the area. Agents searched the CS both before and after the purchase of cocaine from the defendant and found no contraband. The substance later field-tested positive for the presence of cocaine, and weighed approximately 29.6 grams. This controlled purchase occurred within 1000 feet of Children's Guild D.C. Public Charter School.

20.     On March 7, 2018, under law enforcement supervision, the CS purchased approximately two ounces of cocaine from the defendant in exchange for $2,800. Prior to the purchase, the CS arranged to meet in the vicinity of K Street Northwest and Wisconsin Avenue, Northwest, Washington, D.C. After being provided with an audio-recording device and pre-recorded law enforcement funds, the CS was transported by FBI agents to a location near the transaction location. A short time after, the CS arrived at the predetermined buy location; the defendant was observed in his known white Infiniti, parked at 1044 Wisconsin Avenue, Northwest, Washington, D.C. The defendant was seen going into the trunk of his vehicle and removing a small black bag. The defendant then entered through the driver's side of his vehicle, and the CS entered the front passenger seat of the defendant's vehicle. The CS gave the defendant the prerecorded law enforcement funds, and in exchange, the defendant removed a small Ziploc bag from a small black bag containing a white powdery substance and gave it to the CS. Following this transaction, the CS exited the vehicle, and the defendant departed the buy location, heading south on Wisconsin Avenue, Northwest. Agents searched the CS both before and after the purchase of cocaine from the defendant and found no contraband. The white powdery substance later field-tested positive

for the presence of cocaine and weighed approximately 56.6 grams. This controlled purchase occurred within 1000 feet of Georgetown Montessori School.

21.    On March 14, 2018, under law enforcement supervision, the CS purchased approximately two ounces of cocaine from the defendant. Prior to the purchase, the defendant arranged to meet with the CS in the vicinity of 1044 Wisconsin Avenue, Northwest, Washington, D.C. After receiving an audio-recording device and pre-recorded law enforcement funds, was agents drove the CS to the vicinity of the transaction location. The CS walked to the pre-determined meeting location. At approximately 1:06 p.m., agents observed the defendant in his known vehicle, a white Infiniti sedan bearing VA tag VBB-1640, parked in front of 1044 Wisconsin Avenue, Northwest. The CS got into the passenger-side of the defendant's vehicle at approximately 1:12 p.m. When the CS entered the defendant's vehicle, the defendant got out of the driver's side of the vehicle, retrieved a small, black bag from the trunk, and re-entered the driver's side. The CS gave the defendant the law enforcement funds in exchange for a plastic bag containing a white powdery substance, which later field-tested positive for the presence of cocaine and weighed approximately 57.1 grams. The CS exited the vehicle at 1:13 p.m., and was later met by agents at the staging area. At approximately 1:31 p.m., a grey Ford SUV bearing New York tag HGG-2277 arrived at 1044 Wisconsin Avenue, Northwest, Washington, D.C. An unknown black male wearing a black stocking cap and red coat exited the Ford and entered the defendant's Infiniti. At approximately 1:33 p.m., the black male exited the defendant's vehicle, re-entered the Ford SUV, and departed the area. According to law enforcement, these observations are consistent with a narcotics transaction. Agents searched the CS, who was free of contraband before and after the controlled purchase. This controlled purchase occurred within 1000 feet of Georgetown Montessori School.

22.     On March 27, 2018, under law enforcement supervision, the CS made a controlled purchase of approximately two ounces of cocaine from the defendant. Prior to the purchase, the defendant arranged to meet with the CS in the vicinity of the Wells Fargo Bank located at 2119 Bladensburg Road, Northeast, Washington, D.C. After being provided with an audio-recording device, and pre-recorded law enforcement funds, the CS was driven by agents to the vicinity of the buy location. At approximately 1:05 p.m., the defendant arrived at the buy location in his other known vehicle, a white Jeep SUV bearing VA tag VDJ-2268. The CS arrived at the buy location at approximately 1:20 p.m., walked over to the defendant's Jeep, and entered the front passenger seat. The CS gave the defendant the pre-recorded law enforcement funds in exchange for two plastic bags containing a white powdery substance, which later field-tested positive for the presence of cocaine and weighed approximately 58.8 grams. The CS exited the vehicle three minutes later at approximately 1:23 p.m. and departed the area. Agents searched the CS, who was free of contraband before and after the controlled purchase. This controlled purchase occurred within 1000 feet of Children's Guild D.C. Public Charter School.

23.     On April 11, 2018, under law enforcement supervision, the CS made a controlled purchase of approximately two ounces of cocaine from the defendant in exchange for $2,800. Prior to the purchase, the CS arranged to meet with the defendant in the vicinity of Carolina Kitchen, 2350 Washington Place, Northeast, Washington, D.C. After being provided with an audio-recording device, and pre-recorded law enforcement funds, was agents dropped off the CS at the buy location. A short time later, the defendant contacted the CS, requesting that the CS meet him at Carolina Kitchen. The CS met with the defendant inside of Carolina Kitchen. Afterwards, both the CS and the defendant left Carolina Kitchen and entered a parking garage. The defendant then led the CS to his known vehicle, a white Infiniti sedan, and opened the trunk to retrieve a plastic

bag. The CS gave the defendant the pre-recorded law enforcement funds in exchange for a plastic bag containing two Ziploc bags containing a hard white rock-like substance. Following the transaction, the CS left the area. Agents observed the defendant leaving the parking garage in his known white Infiniti. The CS was searched both before and after the purchase of cocaine from the defendant. The substance later field-tested positive for the presence of cocaine and weighed approximately 58 grams. This controlled purchase occurred within 1000 feet of Calvary Christian Academy.

24.     On April 19, 2018, under law enforcement supervision, the CS purchased approximately two ounces of cocaine from the defendant in exchange for $2,800. Prior to the purchase, the CS arranged to meet with the defendant in the area of 1044 Wisconsin Avenue, Northwest, Washington, D.C. After being provided with an audio-recording device, and pre-recorded law enforcement funds, the CS was transported by FBI agents and dropped off near the location of the transaction location. Prior to the controlled purchase, the defendant was observed exiting his vehicle and removing a light brown plastic shopping bag, which appeared to have an object in it, from the trunk of his vehicle. The defendant then reentered the driver's side door of his vehicle. The CS arrived and entered the front passenger seat of the vehicle. The defendant removed two small Ziploc bags, each containing a white rock-like powdery substance, from the plastic shopping bag. The CS gave the defendant the prerecorded law enforcement funds in exchange for the two small Ziploc bags containing the white rock-like powdery substance. Following the transaction, the CS exited the defendant's vehicle and left the area. The substance later field-tested positive for the presence of cocaine and weighed approximately 59.1 grams. This controlled purchase occurred within 1000 feet of Georgetown Montessori School.

25.     On June 5, 2018, under law enforcement supervision, the CS made a controlled

purchase of approximately 129.2 grams of cocaine from the defendant. Prior to the purchase, the defendant arranged to meet with the CS in the vicinity of the CVS located at 1201 1st Street, Northeast, Washington, D.C. After being provided with an audio-recording device and pre-recorded law enforcement funds, agents drove the CS to the vicinity of the buy location. At approximately 3:08 p.m., the defendant was observed walking out of the AVA NoMa Apartment Building located at 55 M Street, Northeast, carrying a black bag. The defendant approached the CS in front of the CVS. The defendant, thinking that they were going to conduct a smaller transaction, did not have the 125 grams of cocaine with him. The defendant told the CS that he would go and get it while the CS waited downstairs. The defendant then left to retrieve the requested amount of cocaine from the upstairs apartment. Several minutes later, the defendant arrived in his white Infiniti sedan and picked up the CS. The CS got into the passenger side of the defendant's vehicle and gave the defendant the law enforcement funds. The defendant, in exchange, gave the CS a black cloth bag containing a plastic shopping bag that had one clear Ziploc bag and two clear sandwich bags, each containing a white powdery substance. The defendant then drove the CS to the Wendy's restaurant located at Florida Avenue, Northeast and New York Avenue, Northeast, Washington, D.C. The CS exited the defendant's vehicle and the defendant departed the area. At approximately 3:47 p.m., agents met the CS at the staging location and seized a black cloth bag containing a plastic shopping bag. Inside the plastic shopping bag was one clear Ziploc bag and two clear sandwich bags containing a white powdery substance, which later field-tested positive for the presence of cocaine and weighed 129.2 grams.

26.     On July 11, 2018, under law enforcement supervision, the CS made a controlled purchase of approximately 59.4 grams of cocaine from the defendant. Prior to the purchase, the defendant arranged to meet with the CS in the Wells Fargo parking lot at 2119 Bladensburg Road,

Northwest, Washington, D.C. After being provided with an audio-recording device and pre-recorded law enforcement funds, the CS was driven by agents to the vicinity of the buy location. At approximately 1:17 p.m., the defendant was observed in his known white Infiniti sedan in the Wells Fargo parking lot.

27.     As soon as the defendant parked, agents observed an unknown black male wearing a white t-shirt enter the defendant's vehicle on the passenger side. Several minutes later, at approximately 1:21 p.m., the defendant exited his vehicle and opened the trunk. He removed a black bag with straps similar to a backpack, closed his trunk, and re-entered his vehicle. At approximately 1:25 p.m., the unknown black male exited the defendant's vehicle, walked across the Wells Fargo parking lot, and entered a dark blue-in-color Saturn sedan bearing Maryland tag 9BW9266. FBI Special Agent ("SA") Christine Roe followed the male out of the parking lot. SA Roe coordinated with a Metropolitan Police Department ("MPD") Fifth District police unit to conduct an investigative stop on the Saturn. Less than five minutes later, at approximately 1:30 p.m., MPD Officer Robert Amengual located the Saturn in the 2100 block of New York Avenue, Northeast, and stopped it. During the stop, Officer Amengual asked the unknown black male to turn off his vehicle and remove his seatbelt. The driver complied with this initial request. Officer Amengual then asked the driver to exit the Saturn. Following this request, the driver turned the Saturn into the "on" position and drove away from the area.

28.     SA Roe and U.S. Attorney Investigator and Task Force Officer ("TFO") Derek Starliper, who was also monitoring the stop, pursued the Saturn. The Saturn drove at a high rate of speed eastbound on New York Avenue to the southbound exit for 295. The vehicle merged southbound onto 295, exited the highway, and made a right hand turn onto the 4200 block of Lane Place, Northeast. TFO Starliper observed the driver of the Saturn exit the vehicle. The driver exited

the driver's side door as TFO Starliper turned onto Lane Place, Northeast. The driver was the sole occupant of the vehicle. After the driver exited his vehicle, TFO Starliper pursued him north through residential yards and alleys. While running north through an alley between the intersection of Meade Street and Marne Place, Northeast (closer to Marne Place), TFO Starliper observed the man put his hands into his front waistband. This prompted TFO Starliper to give several commands for the man not to put his hands there. The man nevertheless continued to place his hands into his front waistband area several more times during the foot pursuit. After exiting the alley onto Marne Place, the man ran west towards 42nd Street, Northeast. SA Roe joined the foot pursuit in the 4200 block of Marne Place, Northeast, and stopped and handcuffed him at approximately 1:39 p.m. SA Roe and TFO Starliper retraced the man's flight path and discovered a sock laying in the front yard of 4221 Marne Place, Northeast. This location intersects with the alley and the 4200 block of Marne Place, Northeast, where TFO Starliper observed the man put his hands into his front waistband.

    29.    An inspection of the sock resulted in the recovery of suspected cocaine and heroin. The sock contained the following items:

    (1) a plastic bundle containing a white powder-like substance. The number "55" was written on the corner of the Ziploc bag. The item weighed 58.3 grams and was subjected to a preliminary field test that resulted in a positive color reaction for cocaine;

    (2) a plastic bundle containing twelve small plastic Ziplocs that each contained a tan powder-like substance and one knotted piece of plastic that contained a white powder-like substance. The items weighed approximately 7.5 grams. A portion of the tan powder-like substance was subjected to a preliminary field test that indicated a positive color reaction for opiates; and

(3) a knotted piece of plastic containing a tan powder-like substance. The item weighed approximately 6.1 grams. A portion of the tan powder-like substance was subjected to a preliminary field test that indicated another positive color reaction for opiates.

30.     While police were pursuing the unknown male black who interacted with the defendant, the CS arrived at 2119 Bladensburg Road, Northeast, to conduct the controlled purchase. At approximately 1:34 p.m., the CS entered the passenger side of the defendant's vehicle. Once inside of the vehicle, the CS provided the defendant with $2,800 in pre-recorded law enforcement funds in exchange for two ounces of cocaine. As with every other controlled purchase, the CS was searched both before and after the purchase of cocaine from the defendant. The substance later field-tested positive for the presence of cocaine and weighed approximately 59.4 grams. This controlled purchase occurred within 1000 feet of Children's Guild D.C. Public Charter School.

31.     On August 8, 2018, a grand jury for the U.S. District Court for the District of Columbia returned an eighteen (18) count indictment against the defendant for his abovementioned distribution of cocaine (ten counts), in violation of 21 U.S.C. §841(a) and his distribution of cocaine within 1000 feet of a school (eight counts), in violation of 21 U.S.C. §860.

32.     On August 14, 2018, FBI agents associated with the investigation executed a search warrant on 55 M Street, Northeast, Apartment 601—the defendant's apartment. Inside of the apartment, police recovered approximately $37,000 in U.S. Currency, stashed throughout the apartment. Some of that money—approximately $6,000—was discovered inside of a black bag, consistent with the black bag observed by agents on prior controlled purchases, as detailed above. Agents also recovered five cell phones, including:

a.     One Apple iPhone model A1660, FCC ID: BCG-E3085A, IC: 579C-E3085A

discovered next to the bed in the bedroom (labeled room "E" by agents conducting the search).

      b.      One Apple iPhone model A1784, FCC ID: BCG-E3092A, IC: 579C-E3092A discovered next to the bed in the bedroom (labeled room "E" by agents conducting the search).

      c.      Blackberry Cellular phone, device name: D238, model BlackBerry Q10, model number: SQN100-5, Serial Number: 0732-6807-6064 discovered in the top drawer of the night stand closest to the window in the bedroom ((labeled room "E" by agents conducting the search).

      d.      One Blackberry cellular phone, PRD-53241-004 BlackBerry Q10 SQN100-5, FCC ID L6ARFP120LW, PIN: 2BAC5277, IMEI: 356762050339501  discovered in the top drawer of the night stand closest to the window in the bedroom ((labeled room "E" by agents conducting the search).

      e.      One ZTE Flip Phone Model: Z233V, SKU: Z233VPP, Serial Number: 329F758860D2 IMEI: 99008870366718 MEID HEX: 99000887036671 discovered in the entry hallway in the top drawer of a small dresser near the entry door.

      33.      During the days after the defendant's arrest, while the FBI was in possession of the defendant's Apple iPhone, he received numerous calls on DEVICE 1. Some of the calls were made via Apple's "FaceTime" application.[2] Additionally, the defendant received a number of text messages from "VA ERIC WOLLEMAN" (hereinafter referred to as WOLLEMAN) on an application named "SIGNAL". In a recorded conversation between the CS and the defendant on July 11, 2018, the defendant referenced "FaceTime" and "SIGNAL" several times and asked the CS to download the application. The defendant told the CS that "FaceTime" and "SIGNAL" were undetectable by law enforcement during that conversation. On August 14, 2018 at 8:36 p.m.,

---

[2] This means that the phone, which was plugged into an outlet in order to keep it charged, began receiving alerts and calls. Law enforcement did not answer the calls or otherwise touch the cell phone in any responsive manner.

WOLLEMAN sent the defendant a "SIGNAL" message that stated, "Will need the same tomorrow around 2pm". On August 15, 2018, at 12:23 p.m., the defendant received another "SIGNAL" message from WOLLEMAN that stated, "You ready again?" That same day, at 12:31 p.m., the defendant received another "SIGNAL message from WOLLEMAN that stated, "Say something? Yay or nay". At 1:17 p.m., WOLLEMAN sent another message that stated, "Are u ignoring me?; I told u I'd be quick wit it". At 2:04 p.m. that same day, WOLLEMAN sent yet another message that stated "U look at it but don't answer smh". On August 16, 2018, at 11:42 a.m., the defendant missed a "SIGNAL" call from WOLLEMAN. WOLLEMAN followed up with a "SIGNAL" message at the same time that stated, "Yo…u in town?" Based on your affiant's training and experience, it appears WOLLEMAN is attempting to contact the defendant to arrange another narcotics transaction. WOLLEMAN's message on August 14, ""Will need the same tomorrow around 2pm" indicates WOLLEMAN met with the defendant previously and is requesting the same amount of narcotics purchased. WOLLEMAN's message on August 15, 2018, "You ready again?" indicates WOLLEMAN is checking with the defendant to see if the defendant is in possession of narcotics to sell.

**ANTICIPATED EVIDENCE CONTAINED ON CELLPHONES**

34.    The execution of a search warrant on the DEVICES would allow law enforcement to, among other things: (i) identify communications relating to the trafficking of narcotics and communications evidencing the narcotics relationship between individuals; (ii) provide contact information regarding potential suppliers, customers, and distributors of narcotics; (iii) identify meeting locations for the potential commencement of drug transactions or acquisition of narcotics; and (iv) identify photographs of narcotics and drug paraphernalia (including tools of the drug trade, such as firearms), members of any drug trafficking conspiracy, or items purchased with the

proceeds of drug trafficking. All of the aforementioned information would constitute evidence of the commission of a narcotics trafficking offense in violation of the target offenses. All of the DEVICES were in the possession or constructive possession of the defendant, for whom the grand jury has already found that there exists probable cause to believe committed one or more of the target offenses.

## CAPABILITIES OF CELLULAR PHONES

35.     Based on your affiant's knowledge, training, and experience, a cellphone, a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning systems ("GPS") locating and tracking technology, and accessing and downloading information from the Internet. Similarly, information that has been viewed via the Internet is typically stored for some period of time on the device. Even when a user deletes information from a cellphone, it can sometimes be recovered with forensics tools.

36.     In your affiant's training and experience, examining data stored on cellphones can

uncover, among other things, evidence that reveals or suggests who possessed or used the device, or contain communications relating to the commission of offenses. Your affiant also knows that those involved in criminal activities take, or cause to be taken, photographs of themselves, their associates, property derived from their criminal activities, and their narcotics products, on cellular telephones.

## METHODS TO BE USED TO SEARCH CELLPHONES

37.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, such as, cellphones, I know that:

38.     Searching digital devices, such as cellphones, can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

39.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital

devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

40.     Further, as discussed *supra*, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

41.     Based on all of the foregoing information, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

42.     Because forensic examiners will be conducting their search of the digital devices

in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## CONCLUSION

43.     Based upon the above-referenced facts, your affiant asserts that there is probable cause to believe that Devices 1-5 (as described in Attachment A and incorporated herein by reference) contain evidence of drug trafficking offenses, in violation of 21 U.S.C. §§ 841, 846 and firearms and ammunition offenses, in violation of the target offenses, as well as, evidence of identification, that would further establish the Defendant's commission of the target offenses (as described in Attachment B and incorporated herein by reference).

44.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. I further request that the Court permit the search warrant to be executed at any time given that the Devices are contained on the premises of an FBI secured facility.

45.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Joshua M. Miller, Special Agent
Federal Bureau of Investigation

Sworn and subscribed to before me this ____ day of August, 2018.

G. Michael Harvey,
United States Magistrate Judge
For the District of Columbia